### SOLOMON PIPER *vs.* THOMAS RICHARDSON.

A., for his own use and benefit, brought a writ of entry against B., in the name of C., and recovered judgment for possession of the premises demanded: B. afterwards brought a writ of entry against A., to recover possession of premises adjoining those which had been thus recovered from him, claiming part of them under the same title by which he attempted to defend against the former suit, and part of them under a different title. *Held,* that the judgment recovered by A., in the former suit, was not conclusive evidence in his favor, in the latter suit, although the proof was the same in both suits.

An alien may acquire an indefeasible title to land, by a possession sufficiently long, by the Rev. Sts. *c.* 119, § 12, to bar a suit by the Commonwealth to recover the land.

The decision in *Valentine* v. *Piper,* 22 Pick. 85, recognized and confirmed; viz. that the lines dividing the flats appurtenant to the upland lots lying southerly of Summer Street, in Boston, are to run parallel with the lines of that street.

WRIT OF ENTRY to recover a parcel of flats in Boston, situated below Sea Street and south of Summer Street.

In a former action, brought against the demandant by the tenant, in the name of Andrew C. Valentine and others, for the use and benefit of the tenant, judgment was recovered against the present demandant for a parcel of flats adjoining those which were demanded in the present action. The demandant now claimed part of the flats described in his count, under the same title by which he attempted to defend against said former action, and a larger part thereof he claimed under a different title; it being one of his purposes, in bringing this action, to obtain a revision by the court of the decision in the former action.

At the trial before *Wilde,* J. most of the evidence, on both sides, was the same, in substance, which was introduced on the trial of the former action. So much of this evidence as is necessary to an understanding of the legal questions, which were decided in the case, is stated in the opinion of the court. (See also the report of the case of *Valentine* v. *Piper,* 22 Pick. 85.)

After all the evidence was presented, the case was taken from the jury, to be submitted to the whole court, who, by agreement of the parties, were authorized to draw any inferences of fact which are warranted by the evidence, and to

enter judgment for the demandant or for the tenant, or to send the case to a jury, as the law might require.

The argument was had at a former term.

*Bartlett & B. R. Curtis*, for the demandant.

*Dexter & C. G. Loring*, for the tenant.

WILDE, J.*   The facts proved in this case and in the case of *Valentine* v. *Piper*, 22 Pick. 85, are substantially the same, although several questions of law have been now discussed which were not moved or considered in the former action. That action was brought by the present tenant in the names of Valentine and others, and was prosecuted for his own use and benefit; he having purchased the premises from them. So that the parties in interest, in both actions, are the same. The tenant's counsel therefore have argued, that the judgment in the former action is conclusive evidence in his favor, in this case. But we think it very clear that there is no ground on which this argument can be maintained. To render this evidence conclusive, it must appear that both actions relate to the same property; whereas, the contrary appears from a reference to the two writs, in which the several parcels of flats are demanded. This objection to the evidence is decisive. The property now in controversy was not the subject matter of the former suit; and the fact, that the tenant holds both parcels of flats by the same title, is no sufficient answer to the objection. For the demandant now claims the greater part of the flats, which he demands, by a title which does not extend to the premises recovered in the former action. And besides, the demandant has now taken an objection to the tenant's title which was not raised or considered in the former suit. This objection is, that Elizabeth Price, under whom the tenant claims title, and her children at the time of her decease, were aliens, and that thereupon her estates in this country escheated to the Commonwealth. Whether this objection be well founded or not, the demandant is entitled to have it considered by the court, and is not to be estopped by the former

---

* *Hubbard*, J. did not sit in this case

judgment. We have therefore considered this case on the facts reported, and the inferences to be drawn therefrom, without reference to the decision in the former action.

As to the objection, that Elizabeth Price and her children were aliens at the time of her decease, there are conflicting decisions, upon which, however, we do not think it necessary to express an opinion, for the reasons which will hereafter be stated. Nor do we think it necessary to decide another question, which has been discussed by counsel. It was contended, by the tenant's counsel, that if Elizabeth Price and her children were aliens, their titles to lands in this country were nevertheless protected, and rendered valid, by the sixth article of the treaty of peace, and confirmed also by the ninth article of the treaty of 1794. And the construction of the articles of these treaties, contended for by the counsel for the tenant, is maintained by the decision of the supreme court of the United States, in the case of *Orr* v. *Hodgson*, 4 Wheat. 453. But, as before remarked, we do not consider it necessary to give any decided opinion on this point ; for we think that, without the aid of these treaties, the tenant has proved a valid title by possession, commencing previously to the possession proved by the demandant. And it is very clear that an alien may take real estate by purchase, though not by descent. So he may acquire a title by possession, which, if continued long enough, without the interposition of the State, may establish an indefeasible title.

Now it appears by the evidence, that soon after the treaty of peace, viz. in 1784, William Price and Elizabeth Price took possession of the Price lot, including the demanded premises, and continued their possession undisturbed, taking the rents and profits, until 1820, when they sold it to Lawson Valentine, whose heirs, after his decease, sold the same to the tenant. The right of the Commonwealth to seize this lot of land, as having escheated, if any such right ever existed, has never been enforced or claimed ; and it is now barred by the Rev. Sts. *c.* 119, § 12, which provide that "no suit, for the recovery of any lands, shall be commenced by or in behalf of

the Commonwealth, unless within twenty years after the right or title of the Commonwealth thereto first accrued." The right of the Commonwealth being thus barred, it follows that the tenant has acquired a valid title by possession, not only to the upland, which is not questioned, but also to the flats, as appurtenant to the upland and wharf, by virtue of the ordinance of 1641; (Anc. Chart. 148;) unless the demandant has proved a prior possession by those from whom he has derived his title. And it is contended that he has proved such a possession, commencing as early as the year 1774, under a deed of conveyance from John Preston to Daniel Preston. In that deed, the premises conveyed are bounded westerly by Sea Street, where it measures sixty feet, and holding the same breadth to low water mark; northerly on land of Richard Hunnewell, and southerly on land of Henry Allen. In what direction the side lines of the flats were to run is not mentioned. They must, therefore, be run in such a direction as to include the flats belonging to the Preston lot. And we adhere to our decision in the case of *Valentine* v. *Piper*, and for the reasons therein stated, that the lines dividing the flats belonging to the lots southerly of Summer Street are to run parallel with the lines of that street.

It has been argued that the deed of John Preston to Daniel Preston is to be so construed as to pass the flats in front of the Preston wharf, in conformity with the side lines of the same, and in conformity, as it is said, with the side lines of the upland. But we cannot so construe the deed. It must be presumed that the deed was intended to pass the grantor's actual right and legal title; the contrary not appearing by express words or necessary implication. This was a deed with warranty; and nothing short of a very clear description would make the grantor liable on his covenant of warranty. Then the side lines of the upland have no influence in deciding the direction of the exterior side lines of the flats; as was decided in *Rust* v. *Boston Mill Corporation*, 6 Pick. 158, and in other cases.

Some reliance was placed on the deed from Blackman to

Fessenden and others, which describes the flats, belonging to the Blackman lot, as lying between the Preston wharf and the Sumner wharf, and continuing the same width to low water mark. But this deed was dated in 1800, and cannot affect the construction of the previous deed from John Preston to Daniel Preston. Nor indeed would it, if the former deed had been previous to the latter. For, although the flats conveyed by the latter deed are bounded southerly by land of Allen, who then owned the Blackman lot, yet this must refer to land owned by a legal title, and not by an erroneous claim. *Crosby* v. *Parker*, 4 Mass. 110. And besides ; if the owner of the Blackman lot did encroach upon the Preston lot, that would not authorize the owner of the latter lot to trespass on the lots northerly ; nor could it affect the construction of a prior deed.

Upon the whole evidence, therefore, we are clearly of opinion, that no constructive possession of any part of the demanded premises was acquired before 1784, under the deed from Preston to Preston, nor by any other title deed of the Preston lot, or of the Hunnewell lot. So that if the children and heirs of Elizabeth Price took nothing by descent, on her decease, nor by virtue of the treaties between the United States and England, they have nevertheless acquired the elder and better title to the flats in controversy.

The demandant claims another portion of the flats demanded, as appurtenant to the Clement lot. His counsel contend that there has been an encroachment on the northerly side of that lot, and that although the tenant has thereby acquired, by disseizin, a good title to the upland and wharf, as now held by him, yet that there has been no such open and actual possession of the flats, as will by law constitute a disseizin. Whether this principle is well founded or not, is a question upon which, for the reasons already mentioned, we intimate no opinion. But we are of opinion that the alleged encroachment has not been satisfactorily proved. The question depends principally on ascertaining the original line of high water in front of the Clement lot. If it was as low

as the eastern line of Sea Street, then it is admitted that a part of the flats demanded were included in the Clement lot. There is, undoubtedly, considerable evidence tending to prove that the high water mark was as low as the east line of Sea Street, and in some places perhaps lower. It has been argued that it is highly probable, if not certain, that the street was laid out above the beach or shore; or that it was so located, when it was narrowed from fifty to thirty five feet. This we think probable, as to the general course of the street. But we are not to suppose that the beach or shore was on a straight line the whole extent of the street; and there is strong evidence to show that there was a cove near Summer Street, where the tide probably flowed above Sea Street.

In the deed of Baxter to Bull, in 1668, a particular description of the land conveyed is given, by which it appears, if the description may be relied on, that high water mark at Sum mer Street, was then as high up as the west line of Sea Street, as it was afterwards laid out. And this is confirmed by the testimony of Holbrook, and of Dolbeare. Holbrook testified that he recollected the Price wharf sixty years; that on the south side of it the timbers extended nearly up to Sea Street, and passed by a stone wall built on the lot next south, which appeared to have been built to keep the sea from washing away the street; but that the water had washed over and through the wall, leaving a hollow place, the extent of which he did not state. Dolbeare testified that the timbers of Price's wharf extended up to the street, or rather beyond the wall on the Bradlee lot. Fuller, the surveyor, testified that the Clement lines would correspond with the Price lines, if high water came up into the street. Now the burden of proof is on the demandant, to show that high water mark was as low down as the east line of Sea Street. And the most that can be said of the evidence on this point is, that the fact is left doubtful. But when, in addition to this evidence, we take into consideration the presumptive proof arising from the long and undisturbed possession of the wharf and flats in controversy, by the proprietors of the Price lot, we think it satisfac·

torily negatives the supposed encroachment. Such a possession is strong, and commonly the most satisfactory evidence of rightful claim and legal title. Here there is proved an undisturbed possession of the wharf, for more than a century, by John Bull, the father of Mrs. Price, and by the Price family. But to go back only sixty years, we find that two of the children of Mrs. Price entered on the lot, no one questioning their title, although the family had removed to England thirty years before. In 1795, Thomas Clement purchased the lot adjoining, and afterwards conveyed it to Thomas Clement, jr. neither of whom ever questioned the title of the Prices, or complained of any encroachment. The latter commenced an action against Bradlee, alleging an encroachment on his flats, which action he afterwards dropped; but he never asserted any claim to the flats possessed by the Prices, and afterwards by Valentine. After his death, the demandant took a quit-claim deed from his heirs, in which the flats are described as bounding "northerly by land lately owned by Lawson Valentine;" which must be construed as referring to the land he had purchased of the Prices. So that if the Clement heirs had a title to any part of that land, it probably would not pass by that deed. Of this, however, it is not necessary to express an opinion. For to suppose, after the long possession the Prices have had, that their title, or the title of Mrs. Price's father, commenced by disseizin, and by an encroachment on the Clement lot, is a supposition, to say the least of it, extremely improbable. Most certainly it has not been satisfactorily proved.

The only remaining question to be decided is, whether the tenant's flats are to be limited by a line extended in the direction of the line of his wharf, or by the red line on the plan. And we are of opinion that the latter is the true line, and that his wharf, by mistake or otherwise, on the south side, varied a little from that line, so as to leave a space of one foot and nine inches between them, at the lower end of the wharf. It would not be surprising if this little deviation happened by mistake; though from the evidence we are inclined to think

14 *

otherwise.    The space between the southeast corner of the
wharf and the red line on the plan might have been left for
the purpose of erecting a post there as a fender, and for other
uses.    There is no proof of this, it is true ; but there is proof
that the ends of the timbers, at the foot of the wharf, on the
sea, extended a little beyond the sides of the wharf, from the
street ; and that about half way down, on the south side of
the wharf, there was an old fender, about eight inches in
diameter, at the time when Valentine repaired the wharf,
which he spiked to the timbers of the wharf.    From this evi-
dence, we conclude that the timbers of the wharf were not on
the tenant's south line.    Otherwise, the old fender and the
ends of the timbers at the foot of the wharf, were on the
adjoining lot; which is not to be presumed.    And from this
consideration, and the other evidence reported, we are of
opinion that the red line, laid down on the plan as the south
line of the tenant's flats, is the true line ; the same being par-
allel with the lines of Summer Street, which are, we think,
satisfactorily ascertained.

In disputes as to ancient lines, it is difficult to ascertain
their original location with perfect certainty ; but it seems to
us, that these lines are ascertained with reasonable certainty.
The objection is, that the lines of Summer Street are not
clearly ascertained, or, if they are, that these lines, and the
divisional side lines of the flats, both on the north and south
sides of Summer Street, do not coincide ; that Summer Street,
as laid out, encroached on the flats of the Price lot; and from
this it is inferred that the Prices, or Bull, the father of Mrs.
Price, who owned that lot when Summer Street was extend-
ed, afterwards pushed his or their claim further south, and
encroached on the Clement lot.    This objection was made by
Bull, as long since as 1710, when he applied to the town for
relief.    A committee was thereupon appointed to examine
into his claim, and they afterwards reported that, after exam-
ination of the claim, they found that the wharf then in posses-
sion of E. Dorby (being the thing complained of as an en-
croachment) stood according to the settlement of the select

men, made about the year 1663, and recorded in the town book.  After an acquiescence of more than a century in this report of the committee of the town, it seems quite too late to prove that it was founded on a mistake, unless it could be proved by the most convincing evidence.  The location of this wharf, on the north side of Summer Street, is ascertained by the testimony of Fuller the surveyor.  He testifies that the old wharf was forty one feet wide, and that he ascertained the north line by timbers there remaining ; and that the width of the wharf was ascertained by the old timbers at the jog ; and that he ran a line to the corner of the Bull Tavern lot, being the upland of the Dorby or Gill lot, which he found to be parallel with the north line of the wharf, as fixed by the timbers, and to measure forty one feet ; and that these lines were parallel to the south line of Summer Street.  It is true, that when Fuller made his examination, the wharf which was then standing extended further south ; but this was on an irregular line, and could not be the south line of the lot.  It is also proved, that the buildings on the Price wharf were on the south line of Summer Street, as laid down on the plan ; the street measuring thirty feet, as it was originally laid out.  This evidence proves, we think, the accuracy of the plan, as to the lines of Summer Street ; and as we adhere to our former decision, that the tenant is entitled to his flats in the direction of these lines, we are of opinion, on the whole matter, that this action cannot be maintained.

*Judgment for the tenant.**

* The judgment was entered as follows : The general issue being pleaded and joined, and a jury having been empannelled for the trial of the said issue, the whole case was, by agreement of parties, taken from the jury, to be presented to the full court, who are authorized to draw any inferences of fact which are warranted by the evidence ; and upon the whole matter, the court are to enter a judgment for the demandant or tenant, or send the case to a jury, as they shall be of opinion the law requires ; and the case was continued, from term to term, to the present term ; when it appearing to the court, by the evidence, that the tenant never did disseize the demandant, in manner and form as he hath alleged in his writ and declaration, it is, according to the said agreement of the parties, considered by the court, that the tenant have judgment for his costs against the demandant.